******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

LEVCO TECH, INC. *v.* DOROTHY KELLY ET AL.
(AC 44417)
(AC 44597)

Bright, C. J., and Alexander and Suarez, Js.

*Syllabus*

The defendants E and S, shareholders of the plaintiff, L Co., a family owned
company, appealed to this court from the judgment of the trial court
determining, inter alia, that the defendants R, J and D owned the majority
of the outstanding shares of L Co.'s common stock. S had been the
president, and M, her husband, had been the secretary of L Co. since
its founding. M, S and their children, E, R, D, A and P, each owned ten
of the seventy shares of the common stock issued by L Co. In 2012,
when D had concerns about her marriage, she purportedly created a
trust and transferred her ten shares to S, as trustee for D's children.
Neither D nor S consulted counsel regarding the making of the trust,
and, within forty-eight hours, S agreed with D that the transfer was not
a good idea and took steps to undo it. In 2015, R acquired D's ten shares
and A's ten shares, thereby giving him ownership of thirty shares. After
P's son, J, executed an option to purchase six of P's shares, R believed
that he and J controlled thirty-six shares of L Co.'s stock and gave notice
to the other board members of a meeting in which he proposed to elect
himself to the new position of chairman of the board and chief executive
officer. On November 20, 2015, in an effort to block R from having
majority control of L Co., E drafted a stock purchase agreement under
which L Co. would issue to E twelve new shares and provide a loan to
help him pay for the stock. At 1:50 p.m. that day, notice was sent via
e-mail to the other board members, stating that the board would conduct
a meeting at 2:15 p.m. to effectuate the stock purchase agreement. R,
J and D were out of state at that time and did not attend the meeting,
at which a contested majority of the board, including E and S, approved
the stock purchase agreement. The next day, J and P, who also had
voted to approve the stock purchase agreement, signed documents to
revoke their votes, and E, S and M signed a document approving the
removal of all board members in December, 2015, and declaring invalid
any action taken after November 21. R proceeded with a board meeting
on November 21 and 22, which E and S did not attend. At that meeting,
a resolution was adopted declaring that proper notice had not been
given for the November 20 meeting and that all business conducted at
that meeting was invalid, as the dispute between the family members
by that time had coalesced into a faction that consisted of R, J and D,
and a faction that consisted of E, S and M. The two factions thereafter
continued to conduct their own board meetings at which, among other
things, they executed documents, adopted resolutions and named their
own officers. M's shares were transferred to S in 2017, after the present
litigation commenced. L Co. brought a declaratory judgment action
against D, E, J, M and S seeking a determination, inter alia, of the number
of shares that E owned, and the defendants filed cross complaints against
each other seeking to determine the ownership of L Co.'s stock. The
court determined that D had not created an irrevocable trust and that
she owned her ten shares in November, 2015, when they were acquired
by R. The court also found that R had the right to vote his thirty shares
and that J had the right to vote his six shares in November, 2015, and
that the issuance of twelve shares to E was invalid. On appeal, S and
E claimed, inter alia, that the trial court improperly concluded that,
because the November 20, 2015 board meeting was invalid, L Co.'s
issuance of twelve shares of stock to E was invalid. *Held*:

1. S and E could not prevail on their claim that the trial court improperly
determined that any trust D may have created in 2012 was revocable:
the court's conclusion that it would have been improvident for D to
create an irrevocable trust and that she mistakenly omitted the power
of revocation from the document was legally and logically correct and
supported by the evidence, as the court's finding that D's concern regard-
ing her marriage was transitory was not clearly erroneous in that her

husband did not file for divorce until 2013, which did not become final until 2014, and S's agreement with D within forty-eight hours to rescind the transfer was evidence of S's recognition that D's marital concerns were transitory; moreover, contrary to the assertion by S and E that the court did not consider the relationship between D as settlor and D's children as beneficiaries insofar as that relationship ordinarily belies the need to revoke such a trust, the trial court specifically noted that the relationship was not discussed at trial, but there did not appear to be anything unusual about the relationship, and it did not undermine the court's conclusion, on the basis of all of the factors it considered, that D omitted the power of revocation by mistake; furthermore; the court did not improperly rely on the fact that D did not have counsel at the time she executed the purported trust document, as the absence of counsel was among other factors the court considered, S and D both maintained that D retained ownership of her shares until several years after the present litigation was commenced, and it appeared that S and E did not develop their trust theory until after the parties were embroiled in litigation.

2. The trial court properly determined that the special board meeting on November 20 was invalid due to inadequate notice and, therefore, that the sale of twelve shares of L Co. stock to E at that meeting also was invalid: notwithstanding the assertion by E and S that L Co. had a practice of calling board meetings on short notice, it was readily apparent that, by calling the meeting with only twenty-five minutes notice, E thwarted the underlying purpose of the notice requirement in L Co.'s bylaws and, thus, prevented board members from attending the meeting and opposing the stock purchase agreement; moreover, the evidence supported the court's finding that twenty-five minutes notice was insufficient under both the bylaws and the circumstances under which the notice was issued, as at least three board members were aware that three other board members were out of town at the time the notice was sent, the court appeared to credit the testimony of another board member that the meeting was called with minimal notice to prevent R's faction from attending, and two board members who voted to approve the stock purchase agreement shortly thereafter rescinded their votes.

Argued February 8—officially released August 2, 2022

*Procedural History*

Action for a judgment to determine, inter alia, the number of shares of the plaintiff's common stock owned by the defendant Edward Levene, and for other relief, brought to the Superior Court in the judicial district of Stamford-Norwalk, where the defendant Robert Levene et al. filed cross complaints; thereafter, the case was transferred to the Complex Litigation Docket; subsequently, the court, *Lee, J.*, in accordance with the stipulation of the parties, bifurcated the trial to address first the validity of the parties' claims of ownership of the plaintiff's common stock; thereafter, Sally Levene, as executrix of the estate of Martin Levene, was substituted for the defendant Martin Levene; subsequently, the case was tried to the court, *Lee, J.*; judgment for the defendant Robert Levene et al., from which the defendant Edward Levene et al. filed separate appeals with this court, which consolidated the appeals. *Affirmed.*

*Jeffrey R. Babbin*, with whom was *Matthew Brown*, for the appellants (defendant Edward Levene et al.).

*David P. Friedman*, with whom was *Kristen L. Zaehringer*, for the appellees (defendant Robert Levene et al.).

*Gregory J. Williams*, for the appellee (plaintiff).

*Opinion*

BRIGHT, C. J. In this dispute among family members over control of the family business, the defendants, Sally Levene (Sally), both individually and as executrix of the estate of Martin Levene (Martin),[1] and Edward Levene (Edward), bring these consolidated appeals from the judgment of the trial court determining that the defendants Robert Levene (Robert), Jeffrey Levene (Jeffrey), and Dorothy Kelly (Dot) owned the majority of the outstanding shares of common stock of the plaintiff, Levco Tech, Inc. (Levco). On appeal, Sally and Edward claim that the court improperly determined that (1) Dot had not placed her ten shares of Levco stock in an irrevocable trust and (2) the issuance of twelve shares of Levco stock to Edward was invalid. We disagree and, therefore, affirm the judgment of the trial court.

The following facts, as found by the court in its comprehensive memorandum of decision, and procedural history are relevant to our resolution of this appeal. Levco is a family owned energy supply company that sells heating oil, provides related mechanical services, and acts as a broker for electric suppliers in Connecticut. In 1980, Levco was incorporated in Connecticut and, by 1985, had issued a total of seventy shares of common stock to Sally and Martin and their five children, Edward, Robert, Dot, Susan Levene (Susan), and Philip Levene (Philip). Each person owned ten shares of common stock.

From its founding, "Sally was the president of Levco and responsible for developing the business and maintaining the records. Martin was the secretary and the visionary who helped grow the business and involve family members. As pater familias, he also was a peacemaker between various family members. Edward and Robert were vice presidents. Sally and Martin wanted their children to develop a family business and intended for their children's stake to be shared equally, even though Edward and Robert were performing most of the work while Dot and Susan were working part-time. Martin set a policy that was followed through 2015, that any family members working full-time for Levco should be compensated equally . . . . [S]ince the early 1990s . . . Philip, Robert and Edward would take an equal salary and, if there were funds left over at the end of the year, a bonus would be distributed equally between them. Sally would also receive a bonus when income permitted. Martin did not take a salary.

"In subsequent years, Sally and Martin's grandchildren started to work for Levco as the third generation. Two of these grandchildren were Philip and [his wife] Jane's children, Jeffrey . . . and Allison Prainito ('Allison'). The general rule for members of the Levene family was that a position would be found for any member

who wanted to work at Levco."

Levco's corporate office was in the lower level of Sally and Martin's residence in Stamford (Stamford office). "Levco's corporate records were maintained up to 2015, in a Green Corporate Book ('Green Book'), which includes Levco's certificate, [bylaws], minutes, and transfer ledger. Up to 2015, Sally was responsible for maintaining the Green Book and making entries therein. . . . The Green Book also includes the 'share records' of Levco's stockholders, which document the current issued and outstanding shares of Levco stock, along with shares that have been cancelled. Currently, many of the original certificates for shares of Levco stock ('certificates') are contained within the Green Book, but previously the original certificates were kept in a locked file cabinet in the Stamford office or in the possession of certain individual stockholders. . . . The Green Book was traditionally located in Sally's office (which subsequently became Edward's office) in the Stamford office. The office was unlocked, with the Green Book available for inspection by the stockholders up until at least November, 2015."

"Pursuant to the [bylaws], Levco stockholders elect members to Levco's Board of Directors ('board') at annual meetings of the stockholders. Levco stockholders also, from time to time, elected members to the board at a special meeting of the stockholders." Until 1991, the board was comprised of Martin, Sally, Edward, and Robert. "In 1991, Levco's stockholders increased the number of directors by electing Philip as the fifth member of the board along with Sally, Martin, Edward and Robert. From 1991 through 1996, the board was comprised of these five members. During this time, Sally was president, Martin was secretary, and Edward, Robert and Philip were vice presidents.

"Since at least 1997, Robert voiced his displeasure with certain aspects of Levco management. Robert often complained about the equal compensation with his brothers, expressing a view that he was more valuable to Levco's success and should be paid more than his brothers. Sally, Edward, and Philip, accepting Martin's advice for the company, all believed that for the good of the company and family harmony, equal compensation for full-time employment should be maintained.

"In 1997, Levco's stockholders voted to amend the [bylaws] to permit up to ten directors and four vice presidents, and elected Dot and Susan to the board for a total of seven members. [The] board elected Sally as president, Martin as secretary, and Edward, Robert, Philip and Dot as vice presidents. . . . From September 26, 2009, to December 6, 2013, the board was comprised of seven members: Martin, Sally, Edward, Robert, Philip, Dot, and Susan. During this time, Sally was president, Martin was secretary, and Edward,

Robert, and Philip were vice presidents."

"On July 15, 2012, Dot went to her parents' house to celebrate their anniversary. After dinner, Dot told her parents that she had been unable to reach her husband that day and that she feared that he might have gone looking for an apartment as a result of their marital difficulties. Dot said that it might be good to transfer her shares to Sally because she was concerned that her husband might interfere with Levco's business.

"During this conversation, Sally retrieved Dot's stock certificate no. 5 from an envelope. . . . Dot testified that Sally was in charge of arrangements for this transfer and that she did most of the writing.

"There are two entries on certificate no. 5 in Sally's handwriting that reflect the transaction. They were covered by [white correction fluid] at an unclear time by an unknown person, all witnesses having denied responsibility. . . . The stock transfer record for certificate no. 5 has a column entitled 'new certificate issued to' and, within that column, the words 'Sally Levene' are discernible, without reference to a 'trust' or the words 'Sally Levene, Trustee.' . . . The entry on the right side of the stock ledger corresponding to the column entitled 'to whom shares are transferred,' although also whited out, refers to 'Sally Levene,' without reference to a trust or trustee.

"The reverse side of certificate no. 5 contains a preprinted legend, as on all certificates of Levco stock, which provides for the transfer of the shares represented by the certificate irrevocably to an agent or attorney. Sally altered the legend so that it reads, 'For value received, the undersigned hereby sells, assigns and transfers unto Sally Levene, Stamford, CT, [please print or type name and address of assignee] 10 shares represented by the within [c]ertificate, and hereby irrevocably constitutes and appoints . . . [followed by a blank line] . . . Attorney to transfer the said shares on the books of the within-named [c]orporation with full power of substitution in the premises, Dated [blank].'

"Toward the end of their conversation on July 15, and after the bulk of the entries had been placed in the ledger and stock book, Sally told Dot that she did not want to benefit personally from the stock and that she wanted to hold the stock for the benefit of Dot's three sons. Dot testified that there was no other discussion about a trust, although Sally testified that Dot told her she wanted Sally to hold the stock in trust for her three sons. Dot and Sally did not discuss any terms of a trust, any aspects of trust administration, the trust duration (i.e., whether it was intended to last in perpetuity or whether it would be terminated once the concerns that had given rise to the brief discussion about the trust had ceased), or any dispositive trust provisions. They did not discuss a 'backup' or successor trustee to take

over fiduciary responsibilities in the event that Sally could no longer perform her duties as trustee. Nor did they make any effort to consult legal counsel to ensure the proper format of a trust.

"Sally then filled out a new certificate (i.e., certificate no. 9) relating to Dot's shares, which identified a transfer to Sally as trustee for Dot's three sons. Dot testified that, after she left her parents' house and went home, she changed her mind and decided that the transfer was not a good solution and decided that she should not go through with it. Whether on July 16 or 17, Dot returned to her parents' house and told Sally that she did not think the stock transfer was a good idea. Dot testified that Sally agreed with her. They then took steps to undo or void the transfer, making a new stock ledger entry identifying Dot as the owner of her ten shares, and voiding stock certificate no. 9. In addition  .  .  . certificate no. 9 was cut in half. The stock transfer record for certificate no. 9 has the word 'VOID' written on it in capital letters. Dot and Sally both agreed that the transfer had been undone. Dot testified: 'we undid it the next day.' Sally agreed: 'She [Dot] said she changed her mind and so  .  .  . I voided certificate no. 9.'

"Between 2012 [and] 2015, Dot voted her shares several times without objection. Dot also listed her Levco stock as an asset on her 2014 financial affidavit in marital proceedings. Sally testified that, from 2012 until this action was commenced on or about May 11, 2016, she believed that Dot owned her ten shares and testified that she did not believe that a trust was in effect over those years, although subsequent contradictory evidence was introduced at trial. Sally and Edward listed Dot as the owner of ten shares of Levco stock entitled to vote on the voting lists created by them as late as February, 2016. Sally testified that it was 'only after the commencement of the lawsuit, at some point, I believed that Dot did not own her shares; that they were in trust.'

"After the commencement of this litigation, certificate no. 10 was issued at the request of Sally for the lost [or] destroyed certificate no. 9 on June 15, 2018. Edward recorded the issuance of these shares of Levco stock to Sally on the transfer ledger. At trial, a document entitled 'The Sally Levene 2012 Irrevocable Trust' was introduced. It was executed on March 26, 2018, and states: 'the grantor contemporaneously with execution hereof, assigns transfers and/or contributes to the trustee, and the trustee by execution of this trust agreement acknowledges receipt of the cash and/or property described on the Schedule A.' Schedule A identifies Dot's ten shares as the property to be transferred. Dot claims never to have seen this document until produced in discovery and asserts she would not have consented to Edward as a successor trustee, as provided in the document. The language of this document purports to establish a transfer of Dot's shares from Sally individu-

ally to a trust on March 26, 2018. The consequence of this purported transfer by Sally in her individual capacity in 2018 is that the stock was not held in a trust from 2012 until 2018. Sally, when asked at her deposition about the document, referred to it as a 'mistake.' "

"As of 2015, the company's business consisted mainly of fuel oil distribution, managed and operated largely by Robert, and an electric sales business, managed and operated largely by Edward. Edward was responsible for the marketing and sales in both the oil and electric businesses. Philip and Sally managed the financial operations and administrative aspects of the business, including for oil, at [the Stamford office]. . . . The business was stable and working well.

"Martin suffered a stroke in January, 2015. Sally was still president of Levco at this time but came under increasing time pressures from the business and the declining health of her husband. . . . These factors and Sally's age prompted members of the Levene family to increasingly consider Levco's future. Robert coordinated numerous ad hoc meetings and family gatherings in which Robert expressed his opinion that he should lead Levco. Robert also pressed Sally to resign as president.

"On June 5, 2015, Sally resigned as president after more than [twenty-five] years, effective June 7, 2015, with the understanding that Philip would become the next president. On June 7, 2015, the board elected the following slate of officers: Philip as president, Sally as secretary/treasurer, and Edward and Robert as vice presidents. . . .

"On July 18, 2015, Levco stockholders elected a board comprised of seven members: Edward, Robert, Philip, Jane, Allison, Jeffrey, and Dot. Also on July 18, 2015, the board elected the following slate of officers: Philip as president, Allison as secretary, and Edward and Robert as vice presidents. These were the officers as of November 17, 2015.

"In mid-2015, Robert wanted to lead Levco and to obtain majority control of Levco through ownership of a majority of Levco stock by purchasing various stockholders' shares. Robert coordinated a valuation of Levco and its stock and also sought to obtain employee compensation assessments. Robert convinced Philip to hire Nardozzi & Associates ('Nardozzi') to perform the valuation and to retain Oil Heat Associates to perform employee compensation assessments. Robert also enlisted Dot and Allison in his efforts to obtain a valuation and provide information to Nardozzi.

"On November 6, 2015, Robert sent an e-mail to Philip and copied Sally, Edward, Dot, Susan, Jane, and Doris (Robert's wife). The e-mail set forth three options: [1] that enough shareholders sell him their shares at a purchase price of $1,125,000 for ten shares so that he

would be able to obtain at least a 51 percent or larger ownership percentage; [2] that he sell his shares at the price of $1,125,000 for ten shares; or [3] that the company correct its leadership problems.

"On November 9, 2015, Edward directed Allison to notice a special meeting of the stockholders for November 17, 2015, for the purpose of voting Sally back on the board. Dot signed a proxy for her ten shares to Robert on November 11, 2015. The effective dates listed on this proxy extended from November 12, 2015, to January 1, 2021. As part of this proxy, Robert agreed to purchase Dot's shares of Levco stock on January 1, 2021, but Dot retained the right to cancel the sale upon ninety days' notice. Two assurances were also listed in the proxy agreement: Robert would support the continued use of [the Stamford office] as an office for Sally and support Dot as the leader of the board's compensation committee. . . .

"Susan also signed a proxy for her ten shares to Robert on November 12, 2015, which Robert signed on November 12, 2015. The effective dates listed on this purported proxy extended from November 12, 2015, to January 1, 2016. As part of this proxy, Robert agreed to purchase and Susan agreed to sell Susan's shares on January 1, 2016, with payments of $800,000 due on December 1, 2015, and $325,000 due on January 1, 2016. As a result of these transactions, Robert had acquired voting rights to thirty shares of Levco stock. This included his original ten shares, an irrevocable proxy for Dot's ten shares, and an irrevocable proxy for Susan's ten shares.

"Jeffrey and Philip signed an option on November 11, 2015, for Jeffrey to purchase six of Philip's shares of Levco stock. . . . Jeffrey paid Philip $1000 for the option to purchase six shares of Levco stock. On November 12, 2015, Jeffrey signed a notice of execution of the option but apparently did not pay the full purchase price for these shares. . . .

"On November 12, 2015, Robert sent an e-mail to Philip, Jane, Sally, Edward, Dot, Susan, Jeffrey, Doris, and Allison providing documentation regarding these changes in ownership and voting rights of Levco. Robert believed that the voting right proportions were as follows: Philip—4 shares (5.7 percent); Jeffrey—6 shares (8.6 percent); Edward—10 shares (14.3 percent); Sally and Martin Levene—20 shares (28.6 percent); Robert Levene—30 shares (42.9 percent). As a result, Robert claimed that he and Jeffrey controlled 36 of the company's 70 issued shares. Robert attached the notice of exercise of Jeffrey's option, the option, and the two proxy agreements. Allison, then the secretary of the corporation, received copies of Susan and Dot's proxies to Robert, and Jeffrey's option documents with Philip. . . .

"On November 17, 2015, Philip signed a proxy to Jeffrey, and he and Jeffrey each brought a copy of the proxy to the . . . meeting. Also on November 17, 2015, the noticed meeting of Levco's stockholders was held for the purpose of voting Sally back on the board. Edward, Jeffrey, Martin, Philip, Robert, and Sally attended the meeting, which constituted a quorum pursuant to the [bylaws]. Sally was the only candidate to receive any votes. Edward, Martin, Philip and Sally voted for Sally's election to the board, for a total of 34 shares. Robert and Jeffrey voted against the motion, for a total of 36 shares, counting the proxies from Susan, Dot and Philip. Nevertheless, Edward declared that Sally was elected by a plurality of shares, apparently citing to General Statutes § 33-712. This caused the board to have eight members, i.e., Sally, Edward, Robert, Philip, Jane, Jeffrey, Allison and Dot. Allison prepared and signed the meeting minutes, which minutes were placed in the Green Book.

"On November 18, 2015, Edward created a voting list based on the information that he had at the time, which listed Dot as a shareholder. Also on November 18, 2015, Philip sent an e-mail to Robert, Edward, Dot, Allison, Jane, Jeffrey and Dot stating his resignation as president of Levco . . . . On the same date, Robert sent an e-mail to Philip, Jane, Jeffrey, Sally, Edward, Allison and Dot, giving notice of a meeting of the board to be held on November 21, 2015. Robert included an agenda for this meeting in which he proposed electing himself to a new position of chairman of the board and chief executive officer. Robert also proposed separation of the Levco oil business from the Levco electric business and potentially selling the electric business, which Edward was running at the time. Edward and Sally opposed Robert's proposal.

"Two days later, on November 20, 2015, in an effort to block Robert's majority control, Edward drafted a proposed stock purchase agreement and loan agreement [stock purchase agreement], which he, Philip, Allison, Jane and Sally discussed and revised. The [stock purchase agreement] called for the issuance of twelve new shares to Edward with a loan of $1,350,000 from Levco to him at 4 percent interest due on November 14, 2030, to help him pay for the stock. After these discussions, the [stock purchase agreement] was signed by Philip, Edward, Allison, Jane, and Sally in the morning of November 20, 2015, around noon.

"Thereafter, Edward, Philip, Sally, Allison and Jane determined that a board meeting was necessary to effectuate this document. Pursuant to the [bylaws]: 'Special meetings [of the board] may be called by or at the direction of the [c]hairman of the [b]oard, if any, of the President, or of a majority of the directors in office.' 'Written, oral, or any other mode of notice of the time and place shall be given for special meetings in suffi-

cient time for the convenient assembly of the directors thereat.' 'A majority of the entire [b]oard shall constitute a quorum except when a vacancy or vacancies prevent such majority, whereupon a majority of the directors in office shall constitute a quorum, provided such majority shall constitute not less than the greater of at least two persons or at least one-third of the entire [b]oard. . . . Except as herein otherwise provided, the act of the [b]oard shall be the act, at a meeting duly assembled, by vote of a majority of the directors present at the time of the vote, a quorum being present at such time.'

"At approximately 1:50 p.m., Allison sent out an e-mail notice of the meeting on behalf of the majority of the board as represented by five of the eight members, i.e., Edward, Philip, Sally, Jane, and Allison. The signed version of the [stock purchase agreement] was attached to the notice for a board meeting. The meeting was scheduled for 2:15 p.m., which time was chosen to accommodate a doctor's appointment for Allison that afternoon. Philip and Jane wished to leave relatively early, and the members agreed that 2:15 p.m. was the time when they were all available.

"Robert and Jeffrey were driving back from Maine on this day, leaving about 11 a.m., after having driven there to pay Susan the first installment payment for her stock. Robert was driving, and Jeffrey was in the passenger seat. Jeffrey was checking his phone and read the notice from Allison around 2:30 p.m. Robert pulled over and also read the notice from Allison. Robert and Jeffrey decided to call attorneys. Robert and Jeffrey arrived back in Norwalk between 4 and 4:30 p.m., after the conclusion of the meeting, which lasted about fifteen minutes. Philip, Jane and Allison knew that Jeffrey and Robert were in Maine but did not call them about the meeting after Allison sent the e-mail notice.

"Dot was in a meeting in New York City, having recently returned from a trip abroad. She acknowledged seeing the e-mail notice before 2:15 p.m. She believes that she called . . . but was unable to get through to the meeting. Dot then returned to Stamford and met with Philip and Jane. On the way back, Dot called Robert and Jeffrey.

"At the November 20, 2015 meeting of the board, a contested majority of the board (i.e., Edward, Philip, Allison, Jane, and Sally) voted in favor of the [agreement] for the sale of twelve shares of Levco stock. . . . Thereafter, Levco issued a check signed by Sally to Edward representing the loan of $1,350,000 to pay for the stock, and Edward endorsed the check to Levco for the purchase of the twelve additional shares. . . . Twelve shares of Levco stock were issued to Edward as reflected on certificate no. 11 and recorded by Edward in the Green Book. The [stock purchase agreement] is also included in the Green Book.

"Robert spoke with Dot, Philip, Jane, Jeffrey and Allison on the night of November 20, 2015, and into the morning of November 21, 2015. Following these discussions, Jane and Philip signed identical documents purporting to revoke their board votes for the [stock purchase agreement].

"On November 21, 2015, Edward, Sally, and Martin signed a stockholder action without meeting recorded in the Green Book approving the removal of all members of the board effective as of December 16, 2015, and declaring invalid any action, resolution, or vote taken on or after November 21, 2015. The notice of this action was given to all shareholders. Edward and Sally claim that the action without meeting was signed by stockholders who were holding at least 42 of 82 shares of Levco.

"Robert proceeded with a board meeting in Norwalk on November 21 and 22, 2015, which was attended by Philip, Jane, Jeffrey, Robert and Dot. Robert refused to move the meeting to Stamford despite requests by Sally, who did not want to leave Martin alone. Edward did not attend because he believed it was not a valid board meeting. Robert's board minutes indicate, among other things, that the group revised the minutes of the November 17 stockholder meeting to reverse Sally's election to the board. The minutes also indicate that the group adopted a resolution finding that the meeting of November 20, 2015, lacked proper notice and that all business conducted at the meeting was invalid. The minutes noted that the 'corporate stock certificate book showing the recorded shares is missing' (i.e., the Green Book) and that Jane would create a new one (subsequently referred to as the 'Black Book'). The minutes indicated that Sally, Martin, Edward and Dot had ten shares, with Dot having given a proxy for her shares to Robert, and that Robert had twenty shares, Jeffrey six shares and Philip four shares. The group elected Robert as [chief executive officer (CEO)]/president, Philip as vice president, Jeffrey as vice president/treasurer, and Jane as secretary. At this time, both Robert and Dot had asked for the Green Book. Edward provided copies of the Green Book to Dot and Jane but moved the Green Book to another location in the corporate office and then later off-site in early 2016.

"A purported stockholder action without meeting dated November 27, 2015, was executed by Edward, Sally and Martin, which attempted to limit the size of the board to three, effective December 23, 2015. On November 28, 2015, a board meeting attended by Philip, Jane, Jeffrey, Robert, Dot, and Edward was held. The minutes refer to an amendment to the [bylaws] providing that the board may only authorize the issuance of shares with approval of a majority of the voting power of the shareholders.

"On December 4, 2015, Philip sent an e-mail to his siblings and Sally, stating that neither he nor Jane wanted to be in the midst of a shareholder dispute and that neither were going to attend any further board or shareholder meetings until the dispute was resolved. Apparently, Robert took this message as a resignation from the board, which was accepted later that day at a board meeting attended by Jeffrey, Robert and Dot. The minutes stated that the board consisted of Edward, Dorothy, Robert, Jeffrey and Jane.

"On December 7, 2015, a shareholders meeting was held with Robert, Dot, Philip, Sally, Edward and Jeffrey in attendance, according to minutes taken by Jane as secretary. Attorneys Gregory Williams and Edward Lerner attended for Levco and Edward, respectively. Robert and Edward presented competing eligible shareholder voting lists. Neither was adopted. Discussion included resolving the factions' differences by arbitration or court proceedings. The location of the Green Book was questioned. The continued operation of the two divisions of the company was also proposed. The meeting broke up after half an hour with no resolutions or votes taken.

"By now, the dispute within the Levene family had coalesced into two factions, which continued as of the time of trial, i.e., Robert's faction, consisting of Robert, Jeffrey and Dot, which operated the fuel oil business, and Edward's faction, consisting of Edward, Sally and Martin, prior to his decease, which operated the electricity business.

"On December 15, 2015, Allison and Philip executed a separation agreement between Levco and Allison. Dot had executed the separation agreement the previous day as the '[Board's] Compensation Committee Chair.' [The separation] agreement called for the payment to Allison of $60,000 in exchange for her release and agreement not to sue. It also called for Allison's agreement to revoke her consent to the [stock purchase agreement].

"On February 12, 2016, a continued shareholders meeting took place, with Dot, Edward, Jeffrey, Robert and Sally in attendance. Neither side accepted the other's voting list, and Robert's faction left the meeting. In their absence, Edward's faction adopted eight resolutions, including a limitation of the board to three members and specifying them to be Edward, Philip and Sally; invalidating actions of the board taken after November 21, 2015; providing that there would be only one official corporate record book, e.g., the Green Book; requiring a two-thirds vote of the voting power to authorize future actions of the shareholders or directors; and adopting a voting list dated November 17, 2015, as follows: Dot—ten shares, Edward—twenty-two shares, Martin—ten shares, Philip—ten shares, Sally—ten shares, and Susan—ten shares.

"Edward's faction also held a board meeting on February 12, 2016, at which Sally was named president, Philip, vice president, and Edward, vice president and secretary. Various other motions were passed consolidating the right of Edward's faction to act on behalf of Levco.

"On February 16, 2016, a shareholders meeting was held, which Robert, Edward, and Jeffrey attended with Attorneys Gregory Williams and Michael Leventhal. The meeting broke down when Attorney Leventhal refused to leave and Edward sought to chair the meeting instead of Robert. Eventually, Edward and Attorney Leventhal left the meeting. The meeting continued and, among other things, [the shareholders] voted to replace the existing board with Robert, Jeffrey and Dot. Edward's faction purported to continue the meeting sine die.

"On February 17, 2016, Philip entered into a severance agreement with Levco signed by Robert, pursuant to which Philip sold his remaining four shares to Levco and received a severance payment and several other benefits. Philip's share certificate no. 8 remains recorded on the share record in the Green Book with no signature evidencing transfer. The Black Book contains an affidavit attested by Philip that certificate no. 8 was lost and replaced by certificate no. 12 transferring four shares to Philip and certificate no. 13 transferring six shares to Jeffrey. A voting list prepared for a shareholder meeting in October, 2017, implies that Philip's shares were retired. Also on February 17, 2016, Jane entered into a severance agreement with Levco signed by Robert.

"On February 18, 2016, Robert's faction held a board meeting at which Robert was appointed CEO, president, and treasurer, and Jeffrey [was appointed] vice president and secretary. [The board] also approved the severance agreements with Philip and Jane. On February 21, [2016], Edward's faction held a board meeting at which Robert and Jeffrey were suspended as employees of Levco, barred from its premises in Stamford and Norwalk, and otherwise deprived of authority to use or remove any corporate assets. Robert and Jeffrey continued to operate the fuel oil business from Norwalk. Edward agreed to hire back Philip at [the Stamford office] almost immediately after the severance. Philip returned as a half-time independent contractor consultant and has continued to work for Levco at [the Stamford office].

"On July 8, 2016, Dot resigned from the board. Robert and Dot subsequently executed an irrevocable proxy agreement that replaced Dot's option and put into effect her requirement to sell in May, 2019. Sally provided Edward a proxy for her shares as of September 4, 2016. The shares originally issued to Martin were transferred to Sally on June 15, 2017. Sally recorded the issuance

of these shares of Levco stock on the transfer ledger in the Green Book. The shares originally issued to Sally and Martin, held by Sally as of June 15, 2017, were subsequently transferred to the Sally Levene Levco Stock Administrative Trust. A certificate was issued to Sally Levene, Trustee of the Sally Levene Levco Stock Administrative Trust on June 15, 2018. Edward recorded the issuance of these shares of Levco stock on the transfer ledger in the Green Book. . . . Both factions have continued to hold contested shareholders and directors meetings." (Footnotes omitted.)

In May, 2016, Levco commenced the underlying action against Dot, Edward, Jeffrey, Martin, and Sally, seeking a declaratory judgment stating the number of shares of Levco owned by Edward. Robert and Jeffrey jointly filed a cross complaint against Edward, Sally, and Martin, seeking, inter alia, a judgment declaring that (1) there are sixty-six shares of Levco stock and that, with respect to the right to vote those shares, Sally, Martin, and Edward each control ten shares, Jeffrey controls six shares, and Robert, as the holder of Dot's proxy, controls thirty shares; (2) Jeffrey's purchase of six shares from Philip and Levco's redemption of Philip's four shares are valid and effective; (3) Dot's proxy agreement to Robert is valid; (4) Robert's purchase of Susan's ten shares is valid; (5) the stock purchase agreement is invalid and ineffective; and (6) all actions taken by Edward on or after November 18, 2015, are invalid. Dot also filed a cross complaint against Edward and Sally seeking a declaratory judgment stating the number of shares Dot owns.[2]

Edward and Sally each filed a cross complaint against Robert and Jeffrey seeking, inter alia, a judgment declaring that (1) there are eighty-two outstanding shares of Levco stock because the stock purchase agreement is valid and effective; (2) Dot transferred ten shares to Sally as trustee for her three children on July 15, 2012, and, therefore, her proxy agreement with Robert is invalid and ineffective; (3) Jeffrey does not own any shares because Philip has not transferred any of his ten shares; (4) Susan has not transferred any of her ten shares; (5) Sally was elected to the board on November 17, 2015; and (6) all actions taken by Robert and Jeffrey on behalf of Levco since November 20, 2015, are invalid and ineffective.[3]

On November 16, 2018, the parties stipulated that the trial of the case would be bifurcated and that, in the first phase of the trial, the court would determine the validity of the claims of ownership of Levco stock and, therefore, who controls Levco. The parties submitted various questions to be answered by the court, which the court distilled to three primary issues: (1) whether Dot owned her shares when she sold a proxy to Robert in 2015; (2) whether Philip's sale of six of his ten shares to Jeffrey was valid; and (3) whether the issuance of

twelve shares to Edward pursuant to the stock purchase agreement was valid.

At trial, Edward and Sally claimed that (1) Dot created an irrevocable trust for the benefit of her three children when she transferred her shares to Sally and, therefore, did not own the shares when she gave Robert a proxy in 2015, (2) Philip's sale of six shares to Jeffrey was invalid because the shares were issued to Philip and his wife, Jane, jointly, and Jane did not sign the documents effecting the transfer to Jeffrey, and (3) the stock purchase agreement was valid. For their part, Robert, Jeffrey, and Dot claimed that (1) Dot's proxy was valid because she never created a trust or, alternatively, because the trust was revoked within forty-eight hours after its creation; (2) Philip individually owned the ten shares; and (3) the November 20, 2015 special meeting of the board, during which the board approved Edward's stock purchase agreement, was invalid due to insufficient notice of the meeting.

After a trial, which spanned nine days, the court issued a memorandum of decision resolving the three principal issues in favor of Robert, Jeffrey, and Dot. First, the court rejected Edward and Sally's claim that Dot had created an irrevocable trust and found that Dot owned her shares in November, 2015, when she issued a proxy to Robert. Second, the court found that Philip owned the ten shares individually and, therefore, that Robert had the right to vote thirty shares and Jeffrey had the right to vote six shares as of November 17, 2015.[4] Consequently, the court determined that Sally was not elected to the board on November 17, 2015, because Robert and Jeffrey's thirty-six votes against Sally's election constituted the majority of the seventy outstanding shares of Levco.[5] Last, the court determined that the issuance of twelve shares of stock to Edward on November 20, 2015, was invalid because (1) twenty-five minutes notice of the special meeting of the board was insufficient, (2) Edward was not a disinterested director qualified to vote on the resolution, and (3) Philip and Jane rescinded their support of the resolution several hours after voting for it. These appeals followed.[6] Additional facts will be set forth as necessary.

I

Edward and Sally first claim that the court misapplied the doctrine of mistake in finding that Dot created a revocable trust in July, 2012. For their part, Robert, Jeffrey, and Dot claim that the court found that Dot transferred her shares to Sally individually and not to a trust and that, assuming arguendo a trust was created, the court properly found that it was revoked. We note that the parties dispute whether the court found that Dot created a trust when she transferred her Levco stock to Sally. Although the court's decision is ambiguous in this respect, because we conclude that the court properly found that any trust that may have been cre-

ated was revoked, we need not resolve the ambiguity.

The following additional facts are relevant to this claim. In its memorandum of decision, the court cited *Goytizolo* v. *Moore*, 27 Conn. App. 22, 604 A.2d 362 (1992), for the relevant legal principles regarding the revocability of trusts: "General principles of trust construction require an express reservation of the right to modify, amend, or revoke a trust. . . . One exception to this rule is in cases where the settlor mistakenly omitted the power to revoke the trust. . . . Certain factors are relevant in determining whether the settlor intended to reserve the power to revoke a trust and by mistake omitted such a power in the trust instrument. Some of these factors are: (1) the fact that the creation of the trust without reserving power of revocation would be an improvident act of the settlor; (2) the fact that the settlor when he created the trust did not have independent legal advice; (3) the relationship between the settlor and the beneficiaries; (4) the reasons which induced the settlor to create the trust . . . ." (Citations omitted; footnotes omitted; internal quotation marks omitted.) Id., 27.

After setting forth the relevant law, the court addressed the issue as follows: "[T]he essential facts are clear. Dot transferred her ten shares of stock to Sally. It appears that Sally told Dot she would hold the shares for the benefit of Dot's children. The word 'irrevocable' was not mentioned. One or two days later, Dot and Sally agreed to rescind the transfer and consistently maintained that Dot retained ownership of her shares until several years after the litigation was commenced.

"The initial conversation was brief and without the benefit of counsel. However, applicable authority holds that a trust can be created orally and without formal discussion of a trust. Given Dot's interest in keeping her stock out of her husband's hands, the court concludes that it was likely that Dot intended to create a trust. However, there is no satisfactory or credible evidence of their intent to make the trust irrevocable or that the topic was even discussed.

"Regardless of whether Dot and Sally actually established a trust on [July] 15, 2012, the court concludes that they revoked it one or two days later. In keeping with the relevant factors discussed [previously], the court finds that (1) the creation of a trust without a power of revocation was improvident because the cause was transitory (i.e., marital instability), but the importance of voting stock in a successful, closely held family company was not, (2) Dot did not have independent legal advice when she transferred her stock to her mother, (3) the relationship between Dot and her children was not addressed at trial, but there is no reason to believe that it was in any way unusual, and (4) the reasons that induced Dot to transfer the stock, as men-

tioned previously, were transitory, and it appears that the marital tension lessened for a time thereafter. Further, the court concludes that there was no meeting of the minds as to the irrevocability of the transfer because it was not discussed.

"The law of trusts is not meant to be a trap for the unwary; *Loomis* v. *Marshall*, 12 Conn. 69, 77 (1837); but, rather, to protect the intent of the settlor. In this case, the interests of Dot, the purported settlor, are best served by holding that any trust created in 2012 was revoked in 2012, and that Dot retained her shares, as acknowledged by Dot and Sally and by the parties' course of dealing in recognizing the validity of her voting her shares for several years in the future.

"As a result, Dot owned her shares when she granted a proxy to Robert in November, 2015."

We begin our analysis with the applicable standard of review. Edward and Sally argue that the court misapplied the relevant legal standard to the facts found, which presents a mixed question of law and fact. "[S]o-called mixed questions of fact and law, which require the application of a legal standard to the historical-fact determinations, are not facts in this sense. . . . [Such questions require] plenary review by this court unfettered by the clearly erroneous standard. . . . When legal conclusions of the trial court are challenged on appeal, we must decide whether [those] . . . conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) *Crews* v. *Crews*, 295 Conn. 153, 162–63, 989 A.2d 1060 (2010). Accordingly, "we review the subsidiary findings of historical fact, which constitute a recital of external events and the credibility of their narrators, for clear error, and engage in plenary review of the trial court's application of . . . legal standards . . . to the underlying historical facts." (Internal quotation marks omitted.) *ASPIC, LLC* v. *Poitier*, 208 Conn. App. 731, 742, 267 A.3d 197 (2021).

We now turn to this court's decision in *Goytizolo* v. *Moore*, supra, 27 Conn. App. 22, on which the trial court relied and which Edward and Sally agree illustrates the proper application of the doctrine of mistake. In *Goytizolo*, in August, 1955, after purchasing a parcel of real estate, the defendant conveyed the property by quitclaim deed to her mother in trust for the plaintiff, the defendant's daughter. Id., 23. In 1973, the defendant's mother conveyed the same property by quitclaim deed to the defendant in trust for the plaintiff. Id. In 1987, the defendant, both individually and as trustee for the plaintiff, conveyed the property by quitclaim deed to her husband without mentioning the trust, and her husband then conveyed the property by quitclaim deed back to the defendant, also without mentioning the trust. Id., 24. The plaintiff sought to have the 1987 conveyances between the defendant and her husband declared null

and void. Id. The trial court found that the defendant had created an enforceable trust in favor of the plaintiff and ordered the defendant to convey the property to the plaintiff. Id.

On appeal, this court affirmed the trial court's finding that a trust was created and proceeded to consider whether the trust was revocable. See id., 26. The defendant argued that "she established a trust in order to shelter her real estate property only until such time as she had automobile insurance coverage, and that once that purpose no longer existed, she would be able to regain title." Id. Relying on the factors set forth in the Restatement (Second) of Trusts, this court determined that the trust was irrevocable.[7] See id., 27–28. The court reasoned that "there was no reservation of the right to revoke the trust. Nor was there anything to indicate that the defendant mistakenly omitted the right to revoke. Nothing suggests that the creation of the trust without a power of revocation was an improvident act. The defendant-settlor consulted an attorney who drafted the August 1955 deed. The relationship between the settlor and the beneficiary as mother and daughter is a factor in favor of the creation of a trust, and the enduring nature of that relationship ordinarily belies the need to revoke a trust for the benefit of either. Even if the defendant's testimony regarding her reasons for creating the trust were true, many years elapsed after the defendant became insured during which period nothing was recorded on the land records that attempted to revoke the trust." Id., 28. As this court's decision in *Goytizolo* demonstrates, the question of whether the settlor of the trust mistakenly failed to state that the trust was revocable is fact intensive.

The facts involved in *Goytizolo* are markedly different from those in the present case. In *Goytizolo*, the settlor had consulted an attorney who prepared the deed creating the trust, whereas Dot spontaneously decided to give her Levco shares to Sally without consulting an attorney regarding the transfer or the creation of a trust. In addition, in *Goytizolo*, despite her claim regarding the transitory nature of the concerns that prompted her to create the trust, the settlor did not seek to revoke the trust for "many years" after those concerns had dissipated. In the present case, by contrast, within a day or two after Dot transferred her shares to Sally, they both "agreed to rescind the transfer and consistently maintained that Dot retained ownership of her shares until several years after the [present] litigation was commenced."[8] In fact, it appears that Sally and Edward did not develop their trust theory until after the parties were already embroiled in litigation. Given these distinctions, we find no inconsistency between the application of the Restatement factors in *Goytizolo* and the court's analysis in the present case.

Edward and Sally contend that the court failed to

consider the relationship between the settlor and beneficiaries. They highlight this court's reasoning in *Goytizolo* that the mother-child relationship between the settlor and beneficiary "ordinarily belie[d] the need to revoke a trust for the benefit of either." *Goytizolo* v. *Moore*, supra, 27 Conn. App. 28. They argue that the court failed to consider this factor and that, because the beneficiaries were Dot's children, this factor supports a finding of irrevocability. The court, however, did not omit this factor from its analysis. Indeed, the court specifically noted that the relationship between Dot and her children was not discussed during the trial, but there did not appear to be anything unusual about the relationship. Moreover, there is no requirement that the court give greater weight to any particular factor under the analysis. Therefore, even if this factor weighs in favor of irrevocability, it does not undermine the court's conclusion, on the basis of all of the factors it considered, that Dot omitted the power of revocation by mistake.

Edward and Sally next argue that the court erred in finding that it would have been improvident for Dot to create an irrevocable trust because "the undisputed purpose of Dot's trust was to shield Dot's assets from her husband, underscoring that irrevocability was key to effectuating Dot's intent." In support of this argument, they direct our attention to comment (h) to § 332 of the Restatement (Second) of Trusts, which provides in relevant part: "The reasons for which the trust was created may indicate that the settlor intended to reserve a power of revocation, although no such power was reserved in the trust instrument. Thus, if it is shown that the reason of the settlor for creating the trust was to meet a temporary emergency, this is evidence that he did not intend to make the trust irrevocable.

"On the other hand, the reason for which the trust was created may indicate that he did not intend to reserve a power of revocation. Thus, where the reason of the settlor for creating the trust was to prevent her husband from reaching the property or to prevent her children from bringing pressure to bear upon her to convey the property to them, these circumstances tend to support the inference that the settlor did not intend to reserve a power of revocation." 2 Restatement (Second), Trusts § 332, comment (c), p. 148 (1959).

They argue that "Dot's scenario is literally hornbook law. . . . She sought to place assets beyond the reach of her soon-to-be ex-husband, and Dot made sure of it by creating an irrevocable trust, which could not be invaded." To be sure, the general factual scenario described in the Restatement (Second) of Trusts could be seen as describing Dot's situation in 2012, if Dot's concern was firmly held. The court, however, found, based on the evidence before it, that that was not the case.

Specifically, the court found that Dot's concern regarding her marriage was transitory and that "the marital tension lessened for a time" after the transfer to Sally. Edward and Sally contend that the marital instability was not transitory because her husband filed for a divorce in 2013. Notwithstanding the ultimate breakdown of Dot's marriage, which Edward and Sally maintain underscores that the marital instability was not transitory, the court heard evidence to the contrary. With regard to the events in July, 2012, Dot testified that she thought her husband had looked for an apartment, but she explained: "I wasn't getting a divorce. My husband didn't move out [until] many months later and didn't file for divorce until the next year. And then we didn't get divorced until September 25, 2014." In addition, the fact that Sally, Dot's mother and the person who suggested holding the shares for the benefit of Dot's children, readily agreed within forty-eight hours to rescind the transfer is evidence that she, too, recognized Dot's marital concerns at the time of the transfer were transitory. Although the court's ultimate conclusion as to whether Dot made a mistake when she failed to state that the trust was revocable is a mixed question of law and fact subject to plenary review, the court's subsidiary factual finding that Dot's concern was transitory is subject to the clearly erroneous standard of review. See, e.g., *ASPIC, LLC* v. *Poitier*, supra, 208 Conn. App. 742. Further, it is well established that "the trier of fact is not required to draw only those inferences consistent with one view of the evidence, but may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Internal quotation marks omitted.) *Palozie* v. *Palozie*, 283 Conn. 538, 552, 927 A.2d 903 (2007). On the basis of the evidence before the court, including Dot's and Sally's testimony, we cannot say that the court's finding is clearly erroneous.

Last, Edward and Sally claim that the court improperly relied on the absence of counsel to overcome the presumption of irrevocability. They rely on comment (b) to § 332 of the Restatement (Second) of Trusts, which provides in relevant part: "[T]he mere fact that the settlor did not have independent legal advice before he executed the trust instrument is not of itself sufficient evidence that the power of revocation was omitted by mistake." 2 Restatement (Second), supra, § 332, comment (b), p. 146. Notably, however, the court considered the absence of counsel among other factors, including the improvidence under the circumstances of making the trust irrevocable. Accordingly, the court did not rely on the "mere" absence of counsel to support its conclusion, and we are not persuaded that the court's reliance on this factor, among others, was improper.

In sum, the court's conclusion, on the basis of its consideration of the relevant factors, that Dot had omit-

ted the power to revoke the trust by mistake is legally and logically correct and is supported by the evidence in the record.[9]

## II

Edward and Sally next claim that the court erred in concluding that the issuance of twelve additional shares of Levco stock to Edward was invalid. We are not persuaded.

The following additional facts are relevant to this claim. The court concluded that the issuance of twelve shares to Edward was invalid for three distinct reasons. "First, twenty-five minutes' notice of the special meeting of the board on November 20, 2015, was insufficient. Article II, § 5, of Levco's [bylaws] states that 'written, oral, or any other mode of notice of the time and place shall be given for special meetings in sufficient time for the convenient assembly of the directors thereat.' Robert and Jeffrey were returning from Maine, and Dot was at a function in New York City, while the other board members agreed on the plan to issue twelve additional shares to Edward. Their absence from Fairfield County was known to at least three of the other board members, i.e., Philip, Jane and Allison. Allison testified that the notice seemed calculated to avoid their participation. The excuses of a doctor's appointment for Allison and Philip's desire to leave work early are insufficient to justify the minimal notice given, especially when the meeting only lasted a few minutes.

"Second, Edward was not a disinterested director qualified to vote on the resolution. He was plainly benefited by the issuance of valuable stock to be paid for with proceeds of a long-term loan from the company and so had a conflicting interest in the transaction. As a result, the only directors at the meeting qualified to vote for the resolution were Philip, Jane and Allison, which is neither a quorum nor a majority of the qualified directors (counting Robert, Jeffrey and Dot, and not counting Sally). . . . As a result, the vote was insufficient to authorize the issuance of the twelve shares to Edward.

"Third, several hours after voting for the resolution, Philip and Jane signed a rescission of their support of the resolution. A meeting of the directors had been scheduled for the next day, November 21. Edward sought to prohibit the board from adopting a formal rescission by initiating an action of stockholders without meeting that fired all the directors. However, this stratagem failed because Edward's newly issued twelve shares were invalid and, as a result, a majority of the shareholders did not support the action. As a result, the board's meeting on November 21, at which, among other things, the actions of November 20 were rescinded, was valid. Another purported stockholder action without meeting to limit the number of board

members to no more than three was also invalid because it was not supported by a majority of the stockholders." (Citation omitted.)

On appeal, Edward and Sally claim that the court improperly concluded that (1) the November 20, 2015 board meeting was invalid due to inadequate notice of the meeting, (2) Sally's election to the board was invalid and, consequently, that she was not qualified to vote to approve the stock purchase agreement at the November 20, 2015 board meeting, and (3) Philip, Jane, and Allison properly rescinded their votes to issue the twelve additional shares to Edward. Because we conclude that the court properly determined that the November 20, 2015 board meeting was invalid due to insufficient notice of the meeting, we do not address the remaining claims regarding Sally's election to the Board and the rescission of the votes. See footnote 5 of this opinion.

Whether the court properly determined that the notice of the special meeting was insufficient under Levco's bylaws also presents a mixed question of law and fact. Thus, as previously noted in part I of this opinion, "we review the subsidiary findings of historical fact . . . for clear error, and engage in plenary review of the trial court's application of . . . legal standards . . . to the underlying historical facts." (Internal quotation marks omitted.) *ASPIC, LLC* v. *Poitier*, supra, 208 Conn. App. 742.

As a general rule, "notice of a special meeting must be given to every director unless there is some express provision in the charter or bylaws or established usage to the contrary, or unless it is impossible or impracticable to do so. . . . Notice to all directors is required because when a number of directors are elected to manage the affairs of the corporation, it is contemplated that the corporation shall have the benefit of the judgment, counsel and influence of all of those directors. Thus it is only right to hold that, in the absence of special circumstances or express provision to the contrary, every one of them should have an opportunity to be present at meetings of the board.

"A special meeting held in the absence of some of the directors, and without any notice to them, is illegal except in those cases where the articles of incorporation, bylaws, or established custom so provide, or where it is impossible or impractical to give notice. The action at such a meeting, even if made by a majority of the directors, is invalid." (Footnote omitted.) 2 C. Jones, Fletcher Cyclopedia of the Law of Private Corporations (2006 Rev.) § 406, pp. 254–55.

As the Delaware Chancery Court has explained: "The reason and principle underlying [the rule] is this: Each member of a corporate body has the right to consultation with the others and has the right to be heard upon

all questions considered, and it is presumed that if the absent members had been present they might have dissented and their arguments might have convinced the majority of the unwisdom of their proposed action, and thus have produced a different result." (Internal quotation marks omitted.) *Lippman* v. *Kehoe Stenograph Co.*, 11 Del. Ch. 80, 88, 95 A. 895 (1915).[10]

Edward and Sally argue that because Levco often called meetings of the board on short notice and because each board member has access to e-mail and the ability to attend meetings by phone while travelling, the court "committed reversible error when it focused solely on the timing of notice . . . notwithstanding that such timing violated no law or bylaw and was consistent with past practice in this family run business." (Citation omitted.) In response, Robert, Jeffrey, and Dot claim that the minimal notice provided was insufficient under Levco's bylaws and argue that "[e]-mail notice and remote participation are of no help if the notice is received . . . after the meeting is over." We agree with Robert, Jeffrey, and Dot.

The court considered Levco's bylaws and found that twenty-five minutes was insufficient notice for "the convenient assembly of the directors . . . ." Although Edward and Sally emphasize that such short notice was consistent with Levco's past practice, the court's conclusion that the minimal notice was insufficient under the circumstances is supported by its findings. Specifically, the court found that at least three members of the board were aware that Dot, Robert, and Jeffrey were out of town at the time the notice was sent, and it appears to have credited Allison's testimony that the meeting was called with minimal notice in order to prevent Robert's faction from attending. Furthermore, given that Philip, Jane, and Allison rescinded their votes in favor of the stock purchase agreement after conferring with Robert and Jeffrey, it is readily apparent that the underlying purpose of the notice requirement was thwarted. That is, by calling the special meeting with only twenty-five minutes notice to the board, Edward prevented Robert and Jeffrey from attending the meeting and attempting to persuade the rest of the board to oppose the stock purchase agreement. Consequently, we conclude that the court properly determined that, under the specific circumstances leading up to the November 20, 2015 board meeting, twenty-five minutes notice was insufficient under Levco's bylaws.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] After Martin died on February 18, 2018, the court granted the motion filed by the plaintiff, Levco Tech, Inc., to substitute Sally, as executrix of the estate of Martin, in place of Martin.

[2] The revised cross complaint included six counts against Edward, six counts against Sally, and two counts against Martin. Counts one, four, seven, nine, eleven, and thirteen were directed against Edward and sought a declaratory judgment; a determination as to the validity of Edward's alternative

board; the removal of Edward's alternative board; inspection of corporate records; a writ of mandamus to inspect books and records; and to enjoin ultra vires acts. Counts two, five, eight, ten, twelve, and fourteen sought the same relief against Sally. Counts three and six were directed against Martin and also sought a declaratory judgment and a determination as to the validity of Edward's alternative board.

[3] Edward's cross complaint included four counts against Robert and Jeffrey. In the first three counts, Edward sought a declaratory judgment, the removal of Robert and Jeffrey from the board, and to enjoin ultra vires acts. In count four, he asserted a breach of fiduciary duty claim.

Sally's cross complaint included nine counts against Robert and Jeffrey. Counts one through four mirrored the four counts of Edward's cross complaint. In counts five through nine, Sally asserted derivative claims for fraud, a violation of the Connecticut Uniform Securities Act, General Statutes § 36b-2 et seq., statutory theft under General Statutes § 52-564, conversion, and unjust enrichment.

[4] Edward and Sally have not challenged this finding on appeal.

[5] On appeal, Edward and Sally claim that the court improperly determined that Sally was not elected to the board at the November 17, 2015 meeting. They argue that, pursuant to § 33-712 (a), because Levco's certificate of incorporation was silent as to the method of electing directors to the board, the plurality rule applied and, therefore, Sally was elected to the board by a plurality of the votes.

At oral argument before this court, however, counsel for Edward and Sally acknowledged that if this court determines that the court properly concluded that (1) Dot revoked the trust and (2) the issuance of twelve additional shares to Edward was invalid, the issue regarding whether Sally was elected to the board on November 17, 2015, would be moot because Robert and Jeffrey would control the board, as they would have the right to vote the majority of the outstanding shares of Levco.

[6] In Docket No. AC 44417, Edward and Sally, both individually and as executrix of Martin's estate, appealed, challenging the judgments on Levco's complaint, Dot's cross complaint against Edward and Sally, and the two counts of Robert and Jeffrey's revised cross complaint against Martin. See Practice Book § 61-3 ("judgment disposing of only a part of a complaint, counterclaim or cross complaint is a final judgment if that judgment disposes of all causes of action in that complaint, counterclaim or cross complaint brought by or against a particular party or parties").

Because the court's decision did not dispose of all of the counts in the cross complaints brought by or against Edward, Sally, Robert, and Jeffrey, Edward and Sally filed a motion pursuant to Practice Book § 61-4, requesting that the trial court make a written determination that the issues resolved by the judgment are so integral to the outcome of the case that the delay incident to the appeal would be justified. The trial court granted the motion, and this court subsequently granted Edward and Sally's motion for permission to file an appeal challenging the judgments on (1) counts one, two, four and five of Robert and Jeffrey's revised cross complaint; (2) count one of Edward's cross complaint against Robert and Jeffrey; and (3) count one of Sally's cross complaint against Robert and Jeffrey. This resulted in Edward and Sally filing a separate appeal, docketed as AC 44597. This court later ordered that AC 44597 be consolidated with AC 44417.

[7] Although the relevant section of the Restatement (Third) of Trusts was published in 2003, before Dot transferred her shares to Sally in 2012, the trial court relied on the Restatement (Second) of Trusts, which was published in 1959. The parties likewise rely on the Restatement (Second) of Trusts and do not address the applicability of the Restatement (Third) of Trusts.

[8] Edward and Sally highlight comment (c) to § 332 of the Restatement (Second) of Trusts, which provides: "The statement or testimony of the settlor made or given after the creation of the trust that at the time he created the trust he believed that he had power to revoke it is not of itself a sufficient ground for reforming the instrument and permitting him to revoke the trust. His statement or testimony, however, may be sufficient if corroborated by other evidence, or the other evidence may be sufficient without his statement or testimony. The reason is that such statement or testimony is unreliable since the settlor may easily be mistaken as to his former state of mind or may misrepresent it." 2 Restatement (Second), Trusts § 332, comment (c), pp. 146–47 (1959).

In the present case, Dot's testimony regarding her state of mind at the time she created the trust was corroborated by Sally's testimony that she agreed to rescind the transfer a day or two afterward.

[9] Shortly before oral argument, Robert, Jeffrey, and Dot, pursuant to Practice Book § 67-10, filed a notice of supplemental authority regarding Connect-

icut's adoption of the Uniform Trust Code, General Statutes § 45a-499a et seq., effective as of January 1, 2020. At oral argument before this court, they argued that General Statutes § 45a-499oo, which provides that a settlor may revoke a trust unless the terms of the trust expressly provide that it is irrevocable, applies retroactively to the present case. Although § 45a-499oo (a) provides that this provision "shall not apply to . . . a trust created under an instrument executed before January 1, 2020," they claim that the statute nevertheless applies to oral trusts because General Statutes § 45a-499c (30) defines "trust instrument" as "any instrument executed by the settlor . . . that contains terms of the trust, including any amendments thereto." Accordingly, they argued that the statute applies in the present case because there is no trust instrument, as Edward and Sally claimed that Dot created an oral trust. We question the soundness of this proffered construction of the statute. Nevertheless, because we find no error in the court's conclusion that Dot's trust was revocable, we do not address whether the new statutory presumption of revocability applies retroactively to oral trusts created prior to January 1, 2020.

[10] Although the Delaware Chancery Court's decisions are not binding on this court, we find the court's statement of the rationale for the notice rule to be accurate and persuasive.

---